You're on the presentation of the documents known to you at 025-0295. People of the state of Illinois claim to have challenged the Darren L. Aldrige defendant's ability. Our new lawyer for the death penalty, Mr. David S. Friedland. Our new lawyer for the capital penalty, Mr. R. Christopher Price. Good morning. Good morning. Are you prepared to proceed, sir? Good morning, Your Honors. Good morning, Mr. Friedland. My name is David Friedland. I represent the people of the state of Illinois appellant in this matter. May it please the Court. In this case, the people are asking Your Honors to overturn the trial court's order granting defendants motion to suppress a firearm, the evidence being a firearm located on top of a heating duct in a unlocked storage unit of a multi-unit apartment building. And the facts here are really, I've offered in my brief, a litany of Fourth Amendment jurisprudence, multiple exceptions. Do you mind if I? You can cut in as you're going to. Well, I mean, you touched upon the issue describing it as, you know, your brief keeps describing it as an apartment building. Yes. And, you know, you said it's a storage unit in a multi-unit building. The trial court said it's a two-flat sort of, I might be reading this wrong, a two-flat sort of apartment situation built within a home. Do you dispute that? Or is that a finding that we're bound by to defer to? Well, I don't think you're bound by any factual findings here because everything is on video. There's no dispute as to the facts that were offered. So this is an entirely defendant's brief admitted on page 12 that this is a de novo review situation. So if Your Honor is asking whether you're bound by the trial court's determination of what this apartment actually was, well, it's all in the record. You can see photographs, and I don't think there's a dispute as to that. There was no dispute that he lived there. No dispute he lives there. And they knew that. I did that. You can hear on the video. I'm assuming Your Honors have watched the videos. The woman did say that it was his house. She described it as his house. It's his house. That's his address. His address. It's his house. It's listed in the brief. Sure. The detention proceedings, et cetera. Well, I just want to be clear that it's apartment one. The mail says apartment one. There's apartment two. The aunt came in and said there's a second apartment. And she said there's tenants up there. So does that basically blow up your standing argument? It's his house. He's got access to it. It's connected to the basement. My standing argument as to whether he has a privacy interest in the basement? Right. I haven't argued that he has no standing. I've argued that he doesn't have a reasonable expectation of privacy in the basement, that he didn't establish one. And I'll point out, go right to that. You're honest. He didn't. Number one, the aunt comes in. His offer of his privacy interest. And we have to set all of that aside, first of all, because it's what you're judging in the reasonableness of the officer's actions are what they do at the time. As it relates to standing or as it relates to exigency or reasonableness. I think that it goes to the reasonableness. You're asking about standing. Well, Justice Burkett's question was directed towards standing. To the extent that he has, and I would go to the. . . Are you talking about the expectation of privacy?  Okay. Does he have an expectation of privacy, and what is it? Vis-a-vis his apartment in that basement.  And his expectation in that privacy, which is undivided. The aunt says it's hers. That's as good of a description as we get. But she also says that she rents the apartment. She can't possibly have exclusive access to that basement. It's the furnace area. The furnace serves the entire place. She knows her landlord. Whatever expectation of privacy he has in that basement as a member of that apartment, it's less because it is a shared space. The second-floor apartment does not have immediate access to the basement. The second-floor apartment could absolutely access that basement through the outside door. It was an unlocked area. The same way the police accessed it. It's just the way the police did. And I want to point out that nobody is. . . The aunt came in and said everything in the basement. This matters. Everything is hers. She said, in fact, her testimony is that the defendant keeps all of his stuff in his room at his apartment. Where is the expectation of privacy attributed to this defendant? Could he have taken the stand and said, ah, it's his burden. It's his burden to establish an expectation of privacy in that basement. Where is his testimony that says, yeah, I use that basement for my stuff? And, in fact, when you look at his actions, you know that he doesn't have an expectation, at least one that would be recognized as reasonable, of privacy in that basement. Why? What was he doing? He ditched the gun. If he wanted to, why do you not take the gun with you into the place where you have, let's say, the most, the greatest expectation of privacy, your apartment, your bedroom, where his aunt says he keeps all of his things. So either one of the two things has happened here, Your Honors. He's ditched the gun, akin to abandoning. Now, I haven't made an abandonment argument because it isn't because he does live there. But where did he put it? Did he put it in one of his boxes marked defendant or my aunt? No. It was found hidden in an access of the ductwork where you could say he abandoned it or diswanted to disclaim any interest. Can you imagine what the police knew at the time? Yes. They were forcing the door open, and it's clear on the video that they were pushing against the door. One of the officers says, push a little harder, see if you can get a better view. And actually, when the door opened, you see a two-by-four is knocked over. There's a board in the basement. So they were, he didn't block it, but someone, if it wasn't him, it was somebody else, put a board there. Well, in one entire aspect, the door was completely unlocked. And number two, I don't think... It was unlocked, but they had to force the door open. They could go in. I mean, what they could do, they could go in. They would try the first door that was open. But they had to go beyond what the police knew. The police knew he lived there. That is, where he lived. That's what the neighbors told them. Yes. Well, let's go to that, then. My argument, I think I've laid out, is to what is privacy interest. I believe it's lower. I'm going to move on to what the police did and the actions there. Let me ask you this about, you know, in terms of the conduct of the officers. After they know that he's in custody, the sergeant gives an order to search for the gun. That's beyond the scope of a protective sweep, is it not? A protective sweep, quoting from Maryland v. Buey, 494 U.S. 225, a protective sweep is a quick and limited search of the premises incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. And then in Arizona v. Hicks, police officers who were conducting a protective sweep, they didn't just view items, they moved items, and that was beyond the scope of a protective sweep when they moved stereo equipment to write down the serial number. So how is the conduct of the officers, which is clear in the video, as they're searching, they're looking at boxes, the protective sweep is over. I don't know how much clearer I can be that I'm not trying to extend this as a protective sweep. Defendant argued it in his brief. I came back in my reply brief and said I'm not seeking to extend this search or justify the search for the gun as a protective sweep. My first argument is the diminished expectation of privacy in what the office, and then we go to what the officers knew when they opened the door, which they were permitted to do for the protective sweep. And they look in there. You can also hear the officer's comment that says what's in there. They are concerned. Is this a residence? He says no, it looks like storage because it is storage. There's no indicia of occupancy. They open the door. They go in there. The protective sweep is justified. And now what I want to go back to because you jumped ahead to they had already detained him. What I want to go back to, and I didn't even start my spiel, but hey, when the officers arrive, the facts aren't in dispute. The witnesses point out, three independent witnesses, says this guy fired a gun. There he is. The cops give chase. And I think this matters too. At that junction when he flees from the police, and three witnesses point out that he fired a gun at a residence, at an individual in a residence. There's an active discharge right there. There's probable cause to arrest him. Right there. There's probable cause to arrest him. So now we can also agree that the facts are undisputed, that we're talking about 30 minutes. 6.30 p.m. 6.33 p.m. They talk to the witnesses. By 7 o'clock, this is done. All right, so this is, when we talk about accidental circumstance, we talk about what the officers knew. This all has to be factored in into this small time period. And you can see everything on the videos. You can see the accident. You can feel the accident. You can see the officer's actions. Now why I go back to the probable cause matters is because once he fled from the police, there's no question that the officers could have charged into that whole house, arrested him, and searched the whole house. That's not what happened. It isn't what happened, but it could have happened. And so if we're saying at the time, because the officers made an intelligent, safe decision, you know, multi, okay, two-unit, I'll be clear. So two-unit apartment. They don't know what's going on there. They do know that this guy's armed and ran from there. They could have gone in there. Because they take a moment and say, hey, this is a dangerous situation for ourselves. Has the hot pursuit doctrine completely evaporated? The requirements are still there. The arrest began in a public place or the detention from police. He fled away to escape the police. The policy underpinning the doctrine is still there. They surrounded the house. They made a perimeter. If they had just burst in at great risk to themselves, anybody else, we wouldn't be here because it would be absolutely hot pursuit. I think the policy still applies. But let me ask you this. Did anybody see him go into that basement? The basement was, like, on the back side. Sure. And it was unlocked as, you know. When you watch the videos, there's officers in front looking down the street. And let's remember, this is a busy street. There are cars going at 630. You can see the traffic. This is not a residential neighborhood or an isolated area. It matters, too. And you see the officer positioned on the corner. You can see that there's two body cams. One goes behind towards the boats, kicks out the recycling bins. The other tries to go around the front part. She didn't see the defendant go through that area. Nobody saw the defendant go through the front and go up the front. There's only two conclusions to draw, that he went in either the basement of the area and or that he went in that second house. They checked the back door. They perimetered the house. Nobody's come out. Is it a reasonable reference or conclusion that he went into the basement? Absolutely. That was the only place he could have gone in that amount of time where they lost track of him. So they surrounded him. They made sure of it. But now here, if you disagree with the policy of the hot pursuit doctrine, that they had to wait here up and prepare themselves to go in. Well, the problem with hot pursuit is he's already been arrested. The hot pursuit doctrine would have permitted the officers to bust into that. But that's not what happened. I'm guessing. There's a lot of things that could have happened.  Could have happened. We have to use the facts that we can. Excuse me, counsel. Excuse me, counsel. I apologize. I apologize. That might have justified the search, but they didn't have it. So at the point when he was arrested, how could there be a hot pursuit? Well, when we look at the hot pursuit in a Fourth Amendment violation, you have to look at the totality of the circumstances and the reasonableness of the actions of the officers judged in terms of what they did. So at the time when he came out and they were about to go in, that's prior to that is when the other unknown individual started yelling down the stairs. And now they have the presence of another unknown individual in the building who's trying to access the basement where they believe that the defendant had just gone. That changes the metric. You're talking about the other resident upstairs, a cousin or uncle, right? I would just call it the aunt's brother because we don't know if it's a relative. But the police are satisfied when he's sent up. I forget the exact language, but he's not the guy with the gun. And that's confirmed because the defendant's arrested, he's out front, and they just say, they tell him, just stay upstairs. And that was it. Well, I think what that does is they can't know that he's the only person in the building and you have the second flat. What the officers are faced with there is what I'm getting at is the exigency. The testimony throughout the hearing was there are a lot of unknowns. And there are a lot of unknowns. They were given an order to search for the gun. You can hear it on the video. Yes, not disputing the order. The officers, he said, you're right, he said, protective suite, let's find the gun. The officers subjected, but that's not a truth. No, he says this is really a training issue, a case like this, because police officers have to be trained to know when they've got to stop, make a phone call, get a warrant. Sure. You're asking these officers out. Could they have gotten a warrant? Absolutely. They should have gotten a warrant. So now that brings us to your inevitable discovery argument. I was going to address just one more prior to the inevitable discovery. Should have gotten a warrant. The warrant requirement, just to touch on Your Honor's question or issue, again, one of the questions is whether there's undue delay here. The scene isn't secure at that point. You say as soon as they finish the protective suite, secure the place and get the warrant. But they hadn't secured the place yet. The scene wasn't done. They had him, but they didn't know about the place. They didn't know about the under individual. They had not secured everything. So they have to make a judgment call, check this basement area that could be accessible, could be three more people in his apartment, could be ten. We don't know. Could that be a search incident to the arrest? And that's where I'm going next. I was touching on that. But the search incident to arrest here, which was completely ignored by the trial court and basically defense counsel. I get it. It's an unusual situation. But it applies here. It applies. And I've cited the case, the Tillman case, the search incident to arrest applies. Because, and that was what I asked. In Tillman, the police saw the defendant drop something he believed was drugs in the wall. So he, and the appellate court sustained that it was a search incident. Here, nobody knew what the gun was. Well, they are entitled, the search incident does not say that they have to. It's a search of the person or immediate control of the defendant at the time of the arrest. Correct. And the arrest can occur. No, Your Honor, I just want to correct you on one thing. The arrest does not have to occur before. It can, the search can occur before or after. Yes, it could be before.  Right, but here, you could say, well, we arrested him a block away, but it's a search incident. As long as we knew he went through the house. And they did know he went through the house. So it's objective consideration and the subjective intent of the officer. I don't believe the subjective intent of the officer applies to the search incident to arrest. No. My understanding is whether there was probable cause to arrest the defendant, and that's what I led with, is probable cause to arrest him. Then, any place, I'm sorry, I have my time. You know where I'm going. I have another question. Yes. You talked about the other floor, that that was not, the sweep was not completed there. But that's all they could do is a sweep. That's what they tried. That's all they could do. No, under the case law, they can't use a sweep as an excuse to conduct a full-blown search. Right?  Correct. Okay. My argument is that they were not using that. Despite whatever the officer said, his subjective training, whatever you want to say, doesn't make a difference. They can continue the search if there are exigent circumstances. They don't even need to know that it's a search incident to arrest. That's an independent justification. And they can do it, well, I say those are the two that I'm relying on. Well, they had the shooter. I mean, I don't know how many people walk around in red pants. You know what? You're probably right. But the point is, is that the officers didn't know if he acted alone or if there was anybody else. But, you know, had they been concerned, they could have spoken with the upstairs tenant. They never did. It's just not in the record. I don't, you're right. As you pointed out, what could have happened and what should have happened are all great things and wonderful ideas. But we're looking at what they did do and what they did with the time. And that doesn't, just because they didn't. It's kind of like the Russian case where, you know, they never do go look after they search the. . .  Thank you. It's crazy facts. But the red box for the guy's drugs and they don't find the gun. They never continue to search for the gun. The appellate. . . Same here. I mean, as I see it, your argument, you rely heavily on this. I do. On that issue in your brief, it wasn't secure. But they never did anything further to make it secure. I mean, I think the trial court found, and it seems to me the facts show, it was secure in the mind of the police officers. At the point when they did the protective switch of the basement, they just decided to go further. Do you want me to reply or save that for. . . I want to talk real quick. I'm going to let you go into real quickly the search incident to rest because we didn't let you really get there. So in response to what Justice Smalling just asked, the area was secure. They didn't go in as exiting circumstance or any of your other exceptions. You're saying they went in as search incident to arrest. I'm saying that the search incident to arrest provides a valid basis for that search. Because he fled and because there was probable cause to arrest him then, once he went in the house, the officers could search the whole house. If you want to argue that he wasn't in the basement, I argue that the evidence suggested and showed that he was in the basement. And then I go back to whether he had a privacy interest in that basement. Thank you, counsel. We'll have an opportunity for rebuttal. Okay. Mr. White. Good morning, Your Honors. May it please the Court, Chris White on behalf of Mr. Aldrich. The question presented here, as I think we saw from my opponent there, is whether the officer must comply with a warrant requirement of the Fourth Amendment after police officers have detained a suspect, conducted a protective sweep, and then determined that no one was present during that protective sweep. It's undisputed that the defendant didn't own that property, correct? Did not own, correct. He was renting, and he and his aunt. It's a little unclear, I think, whether his name is actually on the lease. I don't know that it matters, but the aunt certainly is, and he was paying the aunt rent for what the aunt understood was the apartment unit that they were in, as well as the basement area, and that they only had access to the bit. They were the only ones that had access without going outside and going around into the basement with a 2x4 in front of the door. They're the only ones who were permitted to go into that unit. So, yes, he didn't own the property, but he certainly had a possessory interest in it at that time. And wasn't the basement accessible by other people? Through the outside door, yes, I don't think it follows if the outside door of a private apartment or a private unit is unlocked, that it becomes somehow public and open to the public, as the state, I think, is trying to suggest, that that does not turn that somehow into some sort of public place of accommodation or really even give them access. They have access, physical access, but they certainly don't have legal access to that. And there's no evidence here that the other apartment had legal access to that part as well, just because there's a furnace in it. I mean, the defendant, I suppose, at some point or his aunt, would provide consent for someone to fix the furnace or whatever need be, just like any other private residence. But I don't think there's anything in here that suggests that he does not have a possessory interest and that someone else does have a possessory interest. He certainly had a possessory interest in the weapon, didn't he? We don't know. I don't even know if it's really clear that is the weapon. That is a weapon. As the state rather said, also, that there's only two options here, since there wasn't actually a hot pursuit, because they didn't know who went into that building. There are only two options. But there are actually three options. He's a resident of that building. He could have brought in the locked door. No one has ruled that out. The only reason they're searching the basement and think he went to the basement is because the basement door was unlocked. No matter how inaccessible, it may have been otherwise, because of the things in front of the door. So they don't know that the defendant actually entered that basement door. They're pretty much assuming, and it's probably a reasonable assumption, but it is an assumption. It's not like they saw this very distinctly dressed man run into the basement and determined, therefore, that if there's anything in the basement, that it would then belong to him. The specific gun, I don't know that that necessarily is a gun. It's a gun that they found at that time. Does it matter where in the house he kept his belongings? I don't think so. I don't think he loses his privacy interest simply because there's no evidence that he personally at that time had something in that room. He certainly has the right at that time to keep things down there. So I don't think that really affects this at all. I think there's also not – the state seems to be focused on the fact that this is an exigency circumstance, but it's really not an exigency circumstance. They're conflating an exigency. By using exigency, they're conflating a sweep with a search. And the sweep is done, and they had time at that point. The residence was secure or could have been secured because they had certainly several officers there and essentially one door. As they pointed out, it wasn't easily accessible from what they knew. So it's not as if there were going to be a lot of people running around there, but they certainly could have someone stand there, keep the upstairs guy from coming down if that was a concern, which it didn't seem to be. There's no evidence at all that he had any type of accomplice or anything. The type of offense doesn't even suggest the work of an accomplice. So there really is no exigency. After they've gone downstairs and discovered, no one is there. The gun is not going to be destroyed. It's not going to be handled by children or anyone else because there's no children down there, and they could keep children out or anyone else. So while the court, or the state rather, claims that it is not attempting to sort of expand really to the point of not requiring a warrant, that's exactly what it's doing. And I think Justice Burkett had it right where this is a training exercise. This is a situation where it is more than just a mere technicality. It's a Fourth Amendment requirement, and if you don't have exigency, which they did not at that time, there's no right at that time to say, well, we're down here anyway, let's take a look around, which is essentially what they did. I think it's more than a legal formality in order to protect the Fourth Amendment from just being totally eviscerated by this type of conflation. How about a search? How about hot pursuit? I don't think there's hot pursuit here because, as was pointed out earlier, no one actually saw him enter that building. To the extent there is hot pursuit, that only would excuse an exigency, which we don't have here. The hot pursuit is you don't know what he did because you're facing him. So you use that, too, in order to prevent the destruction of some of the evidence, correct? Correct, but they had him in custody at that point. But he didn't have the gun. Right, but he wasn't going to do anything with the gun because he was in custody. And there's no evidence to suggest that he was working in concert with anyone else and the police can secure that scene if they think it's in the basement. I mean, also I think it's somewhat important to know that the only reason they went to that basement is because it's the only door they could get into. So the assumption then became that that was the door he entered, therefore the gun would be there. Right, right. So it wasn't done there. When you think about, when we think about this situation, and I think Council pointed out, it happened in a relatively short period of time. It's very fluid. Everything's happening very quickly. So, I mean, were the officers acting reasonably based upon the timing is my question. I mean, were they really stopping and saying, oh, you know, he's upstairs? I mean, they were storming that door, and then people are like, hey, we have him in custody. Should the court take into consideration the rapidity of the actions that are going on by the police officers and the reasonableness of their actions at the time? I mean, in other words, looking at the totality of the circumstances. In this case, no. I don't think so, because as you pointed out, they busted down the door and then were told he's in custody. And then they proceeded with the protective suites, which they're certainly allowed to do. Right. And if, I think, we were to hold them to some level of, I think the state argues at one point, a good-faith exception. But you can't have a good-faith exception or a totality of circumstances situation where you're not proceeding with the required requirements. And the requirement here is before you begin a search, you're required to get a warrant. And the judge even said he would probably grant the warrant, but they didn't do that. They felt it was unnecessary at that point, even though there wasn't a real exigency, because even though the defendant didn't have the gun, and even if the gun were there, we knew there was no one else near the gun who would have taken the gun, destroyed the gun, or anything else, because not only did they not see anyone there, but they had every right and would have secured that door, put two officers at the door, put one just inside the door, whatever, and you're not going to have people wandering in there to destroy evidence, and they didn't even have a reason to believe that that was going to happen. So I don't think you can get rid of that court-defendant requirement just because they essentially just didn't get a warrant and said, going backwards, saying, well, it doesn't really matter because we were down there anyway. Well, how about inevitable discovery, then? The judge said they would give them a warrant. If they had a warrant, they would have found the gun, so... But there was no independent lawful investigation in progress going on over discovery. There's no reason to know that they actually would have necessarily searched it. It wasn't part of an investigation. For inevitable discovery, I think you need to have been following the warrant requirement, been following the required procedural requirements, and then something occurred during a separate investigation that would have uncovered that, not the fact that, well, we didn't follow the Fourth Amendment. We went down there anyway, but we probably would have done that anyway, so it's okay. If they have reasonable suspicion to believe that there's a gun down there, then they can get a warrant. And this is the time actually to do it, I think, going back to the training exercise, because it's not a situation where it occurred all that very quickly. There's no evidence here that this was preventing any sort of extra danger here because he was in custody, the officers were there. It was a perfect storm in which they could have complied with the law, and it wouldn't have created any undue hardship. If we were to apply the inevitable discovery rule, wouldn't we be basically stamping out the deterrent effect of the exclusionary rule? Absolutely. I think that's right. As you said before, I was referring back to his training example. You can't do this, and this is the case in which— And you're not going to get off by saying inevitable discovery. Right. Right. We didn't get a warrant, but we know we found it anyway, so do we really need a warrant? Because I think then you are doing exactly what the state says it's not doing in going beyond ruin. I think that's—you're going to lose that difference, and a sweep could then become a search without any need for any sort of third-party intervention. How about the exclusionary rule? Well, I mean, because the gun was then obtained in violation of the Fourth Amendment, then it should be excluded. The motion to suppress it, therefore, I think was granted correctly. The state should not receive or rid the benefit of using evidence that it obtained unlawfully by violating a pretty basic Fourth Amendment tenet. In exclusionary rule two, don't we balance the individual privacy rights versus— or with the safety of the public? And in this case, I mean, they didn't know where this gun was. They knew it comes out there. There's this guy shooting it into the air. That's how they get the call. So wouldn't the public safety outweigh the privacy rights? No, not here, because you have a situation where there actually was a protective sweep, and you have it in custody. So it doesn't really matter whether the gun's in the basement or not. If that's where you think it is—now, it may be that the gun is somewhere else, and they can—I don't know, they probably couldn't do that without a warrant either, but they're limiting it to this particular area, and since they know it's this area, they can secure this area. They can make sure no one's going to obtain anything that's there, presuming they haven't found the gun yet, and they can just keep it clear. The defendant isn't using the gun, clearly. Whether he has it or not, he's not using it, and he doesn't have it. So it's out there somewhere. But they're not looking around in the yards or in the neighbor's house. They're looking in a very specific area, and that is a basement area of essentially private residence without a warrant after having conducted the protective sweep. And I don't think any interpretation of the Fourth Amendment would consider that to be reasonable under the circumstances. Thank you. If the officer who had arrested the defendant had gotten a warrant, proceeded to search to get a warrant, would that be inevitable discovery? Well, if they had gotten a warrant, it would be entirely permissible, I think, that we wouldn't be here because— They were on their way to the scene with a warrant, and these guys had already searched. Oh, I see. A warrant beforehand. I hesitate to say because I actually don't know what the law would be in that circumstance. I know it wasn't here, but there's no attempt here by all accounts. So it's not a situation where, in that case at least, you could argue some sort of good faith or something because they were attempting to proceed lawfully, but they didn't make that attempt here. And it's clear from the record that they probably knew they were supposed to, but didn't anyway. And I think if you allow that to happen, particularly in cases like this, it's going to lose the meaning of the Fourth Amendment requirement for search entirely. Does this fall on anything? No. Okay. Thank you for your counsel.  Appreciate your arguments. Mr. Friedman. I wanted to begin my rebuttal by just addressing what Justice Burkett does issue about the deterrent effect of the officer's conduct here. In my, to counter your Honor's position, the effect of this is to encourage defendants to flee into their homes to avoid police capture. I mean, that's what this does. The Fourth Amendment exercises a reasonable, it's a reasonableness, totality of circumstances reasonableness analysis. This defendant is defeating an immediate, within moments of shooting in public at another individual. He flees into his home, disobeys the police, and runs in there and hides it. Now, your Honor mentioned the destruction of evidence as an issue. He very well could have been. We have no idea what's going on with that gun until we have found, until we, until the police have found the gun. It hasn't been recovered. It could be being destroyed. We don't know who's there. The police don't know who's there. They have to make a decision. They decided, and we, I've seen crazy things in my time as a prosecutor. They could have, he could have put it in the furnace. It could have been burning. As ludicrous as that sounds, it's a possibility he hit it on a furnace. I, you know, in order to prevent it, these exceptions exist for a reason. And it's exactly to defeat what this defendant tried to do. Should the officers have gotten a warrant? Could they have gotten a warrant? Yes. But it was still, we're dealing with a half hour. We're dealing with, and I go back to it as the officers put it. This is an unknown. This is not a situation where you need to deter flagrant police misconduct. They made a judgment call. You can tell because they were like, is this a residence? They were concerned about the basement being a residence. I'll go to, if you're relying on case law and you're relying on good faith, I'll go to my citation to character. We find the defendant did not have, this is the dryer vent case, and the quotation reads that the defendant did not have an objective expectation of privacy to the dryer vent because the dryer vent was located in a common area where other tenants of the building, the landlord, delivery persons, door-to-door salesmen, and other members of the public had access. Now, the response, of course, is other members of the public. This is a two-flat ability. They didn't have access to the basement like they did the dryer. The landlord certainly does. She does not own that furnace. A landlord, a furnace repair person. Is that in the record? That there's a landlord? Yes. That the landlord has access, free access, to the basement? Or you're just supposed to have them set to be the case? I would make a reasonable inference that the landlord has access to the furnace. Both apartment buildings. Put the other way, that the defendant does not have exclusive access to the furnace or dryer. I think people who rent their homes might be surprised. People might be surprised at the presence that they don't have exclusive access. I'm sorry, I don't want to follow your question, Your Honor. I think people who rent their homes might be surprised at your statements. I'm going to draw on my own experience. You don't have a reasonable expectation of privacy. I would have zero expectation of privacy when I rented an apartment in the city in a three-flat that the landlord would not take care of the furnace. I would have zero expectation that that furnace would be my exclusive possession and that I would have a reasonable expectation of privacy in the ductwork above it, the ductwork anywhere through the residence or the apartment building. So that would be my, I would not be surprised, but that's a personal anecdote. So I've discussed the term effect. I mentioned parodying. I do want to go, I think that draws me to the good faith basis. I have just cited a case where if it's a common area, and that goes back to the officer's determination, the first question before he searched, before they entered, was is it a residence? Does anybody live there? No. It's a common, it looks like storage. So were the police officers knowingly searching a private, what would be the private belongings of a sole apartment? No, they weren't. They believed in good faith that this was a common building because they knew it was two flat and they knew it was unlocked. That goes towards. It looks like a house in the video. It does look like a house in the video, but you know that there's multiple. They can tell that there's two flats, and that's apparent also from the videos, that there's a door in the aunt's testimony. If we go to that, then we have to take the aunt's testimony, even though it wasn't known to the officers at the time that the aunt said it's a two flat and the other people have access to the basement, not through the house, but a separate out exterior entrance to the second floor. Just one moment. Well, that would be the moment that I took. You can wrap up. I'll wrap up. I believe I'm going to rest on my brief. Your Honor has discussed with counsel the inevitable discovery argument. I've made my good faith. I think I've touched on everything. I go back to this, the half hour. This is a dangerous, this is a fleeing felon who'd fired a gun at an individual moments away, one block away, lives around the corner. And, you know, to counter what you're arguing here, the defendant was clearly in custody by the time they entered. In custody. And they had cell phones, the officers. You can call a judge under Article 108. You can call a judge, get an electronic warrant. Sure. Swear to it over the phone. Whether there was an undue delay given those circumstances, when you see the officers stacked up there and in the surrounding perimeter. But they never swept the upstairs. They were satisfied that they had everything they needed. And then they went ahead and searched for the gun. They did search for the gun in the basement, which they believed to be a common area. They didn't go into the defendant's and further violate any sort of privacy right he had there. In this case, the trial court erred. There's multiple exceptions to the Fourth Amendment, all of which I've lifted out through my brief. I ask you, Your Honors, respectfully to reverse the trial court order in the case that allowed the admission of the gun in evidence. Thank you, Your Honors. Thank you. Mr. White, thank you very much, gentlemen, for your evidence here today. We will render a decision in due course. Court's going to be in recess now until our next case at 1 o'clock. Thank you, folks.